IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| KORISSA LYNN ROSE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:13cv835 (JAG) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Korissa Lynn Rose ("Plaintiff") is 36 years old and previously worked as a project manager/customer order clerk, music store manager and customer service representative. On August 4, 2010, Plaintiff filed for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from bipolar disorder, depression, anxiety, obsessive/compulsive disorder ("OCD"), attention deficit disorder ("ADD") and borderline personality disorder features with an alleged onset date of November 10, 2008. An administrative law judge ("ALJ") denied Plaintiff's request for benefits on September 27, 2012. The Appeals Council subsequently denied Plaintiff's request for review on October 17, 2013.

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). Plaintiff challenges the ALJ's denial of benefits on the basis that the ALJ incorrectly determined that Plaintiff could perform work at all exertional levels with nonexertional limitations and that the ALJ erred in affording less than controlling weight to Plaintiff's treating physician's opinions. (Pl.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 17) at 6-8.)

The matter comes before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.[1] For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

Because Plaintiff challenges whether the ALJ erred in determining that Plaintiff had the ability to perform work at all exertional levels with nonexertional limitations and in affording less than controlling weight to Plaintiff's treating physician's opinion, Plaintiff's education and work histories, relevant medical history, Plaintiff's function report, third-party reports and Plaintiff's hearing testimony are summarized below.

A.  Plaintiff's Education and Work Histories

Plaintiff is 36 years old. (R. at 19, 94.) She earned her GED in 2002 and attended some community college classes. (R. at 19, 166.) Plaintiff previously worked as a project manager/customer order clerk, music store manager and customer service representative. (R. at 102-03.)

B.  Medical History

On June 10, 2008, Plaintiff underwent counseling from Natalie Relph, M.D. at Dominion Behavioral Healthcare. (R. at 451-53.) Dr. Relph conducted an initial psychiatric evaluation and noted that Plaintiff had a prior diagnosis of bipolar disorder but no history of consistent

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

treatment. (R. at 451.) Plaintiff reported having chronic suicidal ideation, but no current intent. (R. at 451.) Plaintiff also indicated that she was frequently nervous and anxious and often had trouble sleeping. (R. at 451.) Dr. Relph noted that Plaintiff had soft speech, depressed mood, detached affect and logical thought process. (R. at 453.) Plaintiff demonstrated fair insight and impulse control, as well as intact memory. (R. at 453.) After the examination, Dr. Relph diagnosed Plaintiff with bipolar disorder type II and anxiety disorder, with a Global Assessment of Functioning ("GAF") score of 48.[2] (R. at 453.) Dr. Relph prescribed Lamictal and Seroquel to treat Plaintiff's symptoms. (R. at 453.) On June 25, 2008, Plaintiff complained that her mood was down, that she experienced anxiety and that she had trouble sleeping. (R. at 450.) Dr. Relph noted that Plaintiff remained well-oriented, had logical thought process and exhibited fair judgment, insight and impulse control. (R. at 450.) Dr. Relph prescribed Geodon and Ativan, because Plaintiff did not tolerate Seroquel well and experienced several side-effects. (R. at 450.)

In August 2008, Plaintiff reported feeling "wonked out" and concerned about reacting negatively to the prescribed medications. (R. at 445.) Plaintiff also felt emotionally exhausted due to ongoing conflicts with her boyfriend and lack of consistent sleep. (R. at 444.) On September 16, 2008, Plaintiff described her emotions as less intense, but felt that her OCD symptoms became more problematic. (R. at 443.) Dr. Relph assessed Plaintiff's GAF at 50. (R. at 443.) On October 15, 2008, Dr. Relph prescribed Abilify for Plaintiff. (R. at 442.)

---

[2]      The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate the social, occupational and psychological functioning of adults. Scores ranging from 41-50 indicate serious symptoms or serious impairment in social, occupational or school functioning. Scores ranging from 51-60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. (R. at 20-21.) Notably, the latest version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") has dropped the use of GAF scores, finding that their use has been criticized due to a "conceptual lack of clarity," and "questionable psychometrics in routine practice." DSM-5 16 (American Psychiatric Association 2013).

On December 8, 2008, Dr. Relph noted that Plaintiff's mood remained the same. (R. at 440.) Plaintiff expressed anxiety about starting school in January, and she felt a decline in focus during the previous three months. (R. at 440.) By April 2009, Plaintiff reported feeling anxious and irritable and found school stressful. (R. at 439.) Dr. Relph prescribed Prozac to Plaintiff, finding that Plaintiff could no longer tolerate Abilify. (R. at 439.) By June 5, 2009, Plaintiff's anxiety and focus had improved, making it easier for Plaintiff to attend classes. (R. at 437.)

On September 24, 2009, Plaintiff sought treatment from Dr. Relph for pharmacologic management at Commonwealth Counseling Associates, P.C. (R. at 335.) Dr. Relph noted that Plaintiff had a prior history of bipolar disorder, but ruled out borderline personality disorder. (R. at 335-36.) Plaintiff reported no problematic anxiety and demonstrated logical and coherent speech, appropriate motor activity, clear and lineal thought process and appropriate hygiene and dress. (R. at 335.) Plaintiff's primary concern was her ability to focus and concentrate and found it difficult to be back in school full-time and complete classwork. (R. at 335.) Dr. Relph noted that Plaintiff had no history consistent with adult attention deficit disorder. (R. at 335.)

On December 1, 2009, Plaintiff reported increased irritability when she stopped taking Lithium, but her symptoms decreased by taking one pill daily. (R. at 338.) Plaintiff remained unfocused and forgetful despite lowering her Lithium dosage. (R. at 338.) Dr. Relph noted that Plaintiff appeared well-oriented with appropriate motor skills, clear judgment and good thought process. (R. at 338.) Dr. Relph diagnosed Plaintiff with bipolar disorder and borderline personality features and referred Plaintiff for cognitive testing. (R. at 339.) Dr. Relph assessed Plaintiff's GAF at 60. (R. at 339.)

On December 18, 2009, Plaintiff underwent a psychiatric diagnostic interview examination based on Dr. Relph's referral. (R. at 340-42.) During the examination, Plaintiff

appeared anxious and depressed, but her thought process remained logical. (R. at 340.) The interviewer assessed Plaintiff's GAF at 55 and determined that Plaintiff's anxiety was a major factor in her difficulty concentrating, but thought it unlikely to be adult attention deficit disorder. (R. at 342.)

On February 16, 2010, Plaintiff reported to Dr. Relph that she felt unmotivated, depressed and unfocused. (R. at 343.) As a result, Plaintiff reduced her school course load because of her inability to manage it. (R. at 343.) Dr. Relph noted that Plaintiff appeared well-oriented and exhibited good insight, judgment, memory and impulse control. (R. at 343.) Plaintiff's GAF score remained at 55. (R. at 344.) On March 16, 2010, Plaintiff's depressive symptoms remained the same, but she complained of increased anxiety and obsessiveness. (R. at 346.) Dr. Relph's examination of Plaintiff remained unchanged and assessed Plaintiff's GAF at 55. (R. at 347.)

In April and May 2010, Plaintiff experienced continued depression, anxiety and poor focus. (R. at 349, 351.) Dr. Relph's GAF assessment remained at 55 for both examinations. (R. at 348, 350.) On May 25, 2010, Plaintiff had been taking Wellbutrin, and she experienced no adverse side effects. (R. at 352.) Plaintiff noted that her energy and motivation felt better, and she began walking and jogging approximately six miles per day with her boyfriend. (R. at 352.) Plaintiff also planned a trip with a friend to New York, despite feeling apprehensive about traveling. (R. at 352.) Dr. Relph noted that Plaintiff remained well-oriented, and her judgment, memory and impulse control were intact. (R. at 352.)

On June 24, 2010, Plaintiff complained of continued depression and obsessive compulsiveness. (R. at 356.) Plaintiff reported feeling increased inflexibility, especially related to germs and symmetry, and she refused to sit down in the waiting room for fear of stray hairs

(R. at 356.) Dr. Relph discussed solutions for Plaintiff, particularly to help with scheduling activities, but Plaintiff rejected most of Dr. Relph's ideas. (R. at 356.) In August 2010, Plaintiff began taking Luvox CR and experienced no adverse side effects. (R. at 360.) Plaintiff also planned to take a four-day car trip to Florida with her boyfriend. (R. at 360.) Plaintiff expressed concern that the trip would trigger her anxiety and her phobias, but she wanted to try. (R. at 360.) Plaintiff exhibited good insight, judgment, thought process and impulse control. (R. at 360.)

On October 8, 2010, Plaintiff informed Dr. Relph that she had lost her health insurance coverage and could not afford to pay for Luvox, but would continue to pay for Lithium. (R. at 374.) On November 23, 2010, Plaintiff described increased irritability after stopping her medications. (R. at 377.) Dr. Relph noted that Plaintiff continued to demonstrate good impulse control, judgment and insight. (R. at 377.) Dr. Relph assessed Plaintiff's GAF at 55. (R. at 378.) On July 20, 2011, Plaintiff reported increased flexibility in her OCD, but felt foggy and anxious. (R. at 409.) Dr. Relph assessed Plaintiff's GAF at 55 and noted that Plaintiff continued to have good judgment, thought process and impulse control. (R. at 409-10.) On September 21, 2011, Plaintiff complained of increased irritability and stress due to a recent move and two pending court cases. (R. at 411.) Dr. Relph assessed Plaintiff's GAF at 55 and noted that Plaintiff appeared well-oriented with good judgment, thought process and impulse control. (R. at 411-12.)

On January 23, 2012, Dr. Relph informed Plaintiff that she was discontinuing the doctor-patient relationship due to Plaintiff's failure to attend regular appointments and lack of insurance coverage. (R. at 414.) Dr. Relph recommended that Plaintiff seek additional treatment through her community health board or health organization. (R. at 414.)

On June 18, 2012, Plaintiff was admitted to the Richmond Behavioral Health Authority ("RBHA") for depression, obsessive thoughts, anxiety, fatigue, decreased concentration and sleep disturbance. (R. at 457.) On June 21, 2012, RBHA staff noted that Plaintiff felt "'much calmer,'" that her symptoms were "at baseline" and that her sleep had improved. (R. at 457.) RBHA discharged Plaintiff on June 22, 2012 and referred Plaintiff to the Daily Planet for further treatment. (R. at 457-58.)

Dr. Nestor Vozza treated Plaintiff at RBHA from June 18, 2012 through June 21, 2012. (R. at 454-56.) On June 21, 2012, Dr. Vozza completed a standard Mental Capacity Assessment form evaluating Plaintiff's degrees of limitations resulting from psychological factors. (R. at 454-55.) The form addressed areas of "sustained concentration and persistence," "social interaction" and "adaptation." (R. at 454-55.)[3] Dr. Vozza opined that Plaintiff primarily demonstrated "marked"[4] or "extreme"[5] limitations to each respective statement. (R. 454-55.) Dr. Vozza found Plaintiff to have "extreme" limitations in all social interaction and adaptation statements. (R. at 455.) Dr. Vozza determined that Plaintiff exhibited either "marked" or "extreme" limitations in sustained concentration and persistence statements, but Plaintiff only had "moderate" limitations with regard to "[t]he ability to make simple work-related decisions" and "[t]he ability to perform at a consistent pace with a one hour lunch break and two 15 minute

---

[3] The Mental Capacity Assessment consisted of 17 pre-written statements and answers that required the doctor to check one box on a scale between "none" and "extreme" or "unknown." (R. at 454.)

[4] The Mental Capacity Assessment defined a "marked" limitation as "the inability to function in this area, two third of an eight hour work day." (R. at 454.)

[5] The Mental Capacity Assessment defined an "extreme" limitation as "the inability to function in this area. There is no useful ability to function in this area." (R. at 454.)

rest periods." (R. at 454.) Dr. Vozza also opined that Plaintiff's onset date of disability had existed for twenty years. (R. at 456.)[6]

C. Function Report

On September 13, 2010, Plaintiff completed a Function Report. (R. at 246-53.) Plaintiff indicated that she lived in a house with her significant other. (R. at 246.) She took medication for her bipolar disorder, depression and anxiety. (R. at 232.) These conditions affected her ability to sleep. (R. at 247.) Plaintiff tended to her personal care and indicated that she relied on her boyfriend to remind her to make phone calls and run errands. (R. at 247-48.)

Plaintiff prepared simple meals several days a week. (R. at 248.) She performed household chores, including cleaning and laundering her clothing, but relied on reminders or encouragement from her boyfriend. (R. at 248.) Plaintiff went outside two days a week and would travel by riding in a car. (R. at 249.) She could drive, but typically did not want to go out alone. (R. at 249.) Plaintiff shopped in stores for groceries and toiletries. (R. at 249.) She could count change, handle her savings account and use a checkbook/money order. (R. at 249.) Her ability to handle money had not changed since the onset of her condition. (R. at 250.)

Plaintiff's hobbies included reading and listening to music, but she ceased doing them since the onset of her condition. (R. at 250.) She spent time with friends every few months and went to the store every other week. (R. at 250.) Plaintiff indicated that she needed to be reminded to go places and needed someone to accompany her. (R. at 250.) Plaintiff had no difficulty getting along with family, friends and neighbors, but her condition changed the amount of time that she socialized with friends, and Plaintiff now avoided social activities. (R. at 251.)

---

[6]     Dr. Vozza completed a pre-written "Memo Regarding Onset Date of Disability of Patient," listing Plaintiff's conditions and symptoms, Dr. Vozza's opinion of Plaintiff's onset date and comments.

Plaintiff's condition had no effect on her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs or use her hands. (R. at 251.) Her condition also did not affect her ability to talk, see, hear, complete tasks, follow instructions and get along with others. (R. at 251.) Plaintiff experienced problems remembering, concentrating and understanding. (R. at 251.) Plaintiff explained that her depression clouded her memory, causing difficulty concentrating and understanding things. (R. at 251.) Plaintiff's condition had no effect on her ability to walk. (R. at 251.) She could follow spoken instructions "fairly well" and could understand written instructions, but had to read them several times to comprehend them. (R. at 251.)

Plaintiff indicated that she did not get along well with authority figures. (R. at 252.) Plaintiff did not handle stress or changes in her routine very well. (R. at 252.) Plaintiff indicated that she experienced anxiety, germaphobia and trichophobia (the fear of stray hairs). (R. at 252.) She also noted that she could not function without the help of her significant other. (R. at 253.)

D. Third Party Reports

On October 12, 2010, Plaintiff's significant other, Justin Etheridge, completed a Third Party Function Report. (R. at 254-64.) Mr. Etheridge knew Plaintiff for four years and spent about ten hours or more with her each day. (R. at 254.) He indicated that Plaintiff spent her days sleeping until the afternoon, eating breakfast, taking her medication, watching television and eating dinner. (R. at 255.) Plaintiff's condition affected Plaintiff's ability to sleep. (R. at 255.)

Plaintiff experienced some difficulty tending to her personal care. (R. at 256.) She needed reminders to take care of her personal needs or to take her medicine, but normally Plaintiff showered every two or three days, washed her hair when she showered and fed herself. (R. at 256-57.) Plaintiff prepared her own meals up to four times per week. (R. at 257.)

Plaintiff sometimes vacuumed the house or completed chores for approximately 15 minutes once a month. (R. at 257-58.) Plaintiff went out about one to two times a week and travelled by driving or riding in a car. (R. at 258.) She could drive, but would not go out alone without encouragement or company. (R. at 258.) Plaintiff shopped for personal needs items and groceries in stores and by the computer one to two times per month. (R. at 259.)

Mr. Etheridge listed Plaintiff's hobbies as watching television. (R. at 259.) Plaintiff went to the store approximately two to three times per month to pick up her prescription medications. (R. at 260.) Plaintiff experienced no difficulty getting along with others, but rarely socialized. (R. at 260.) Plaintiff's condition affected her ability to remember and complete tasks. (R. at 260.) Plaintiff could pay attention for approximately 20-30 minutes. (R. at 261.) Plaintiff could follow written instructions and could follow spoken instructions "if reminded and encouraged." (R. at 261.) She was "fine" at getting along with authority figures. (R. at 261.) Plaintiff could not handle stress or changes in her routine well. (R. at 262.) Mr. Etheridge noted that Plaintiff had unusual fears, including "loose hair and other irrational stresses." (R. at 262.)

E. Plaintiff's Testimony

On September 20, 2012, Plaintiff, represented by counsel, testified during a hearing in front of an ALJ. (R. at 31-53.) Plaintiff stated that she received her GED and took some community college classes before she stopped going to school. (R. at 34, 66.) Plaintiff lived in a house with her boyfriend. (R. at 39.) Plaintiff could drive and had a valid license. (R. at 40.) Plaintiff would drive approximately once every other week, usually to go to the store. (R. at 40.) She also relied on her boyfriend to drive her to doctor's appointments, counseling or the store. (R. at 42.) Plaintiff spent her days sleeping, watching television, using the computer and talking with her boyfriend. (R. at 42-43.) Plaintiff did not usually cook, but could make sandwiches and

would snack on food in the house. (R. at 44.) In 2010, Plaintiff traveled to Pennsylvania to visit her family. (R. at 41.) She also took a four-day car trip to Florida with her boyfriend. (R. at 41.)

Plaintiff testified that she was bipolar, had borderline personality disorder, obsessive compulsive disorder and experienced stress, lack of motivation and mood swings that left her unable to work. (R. at 35.) She was fired from her prior job as a project manager in 2007 and began attending community college full-time, but she stopped going to school in 2010 due to stress. (R. at 34-35.) Plaintiff initially reduced her course load before stopping altogether. (R. at 35.) Even attending online classes became too stressful. (R. at 35.) Plaintiff took medication to control her symptoms, but stopped after losing her health insurance, and she could no longer afford to attend counseling. (R. at 45.)

Plaintiff testified that she tried to make an appointment at the Medical College of Virginia/Virginia Commonwealth University School of Medicine ("MCV"), but no one returned her phone calls and it became too overwhelming, so she did not follow through with it. (R. at 46.) Plaintiff was then admitted to the RBHA crisis unit for five days, but did not see anyone regularly there. (R. at 47.) Staff members at RBHA referred Plaintiff for counseling at the Daily Planet after she was discharged. (R. at 45.) Plaintiff testified that RBHA was "supposed to set me up with somebody to see at Daily Planet." (R. at 45). She stated that she left several messages to make an appointment, but no one at the Daily Planet returned her phone calls. (R. at 45.) Plaintiff continued to take a quarter of her prescribed dosage of Lamictal. (R. at 48.) Plaintiff testified that she struggled with deadlines and dealing with people. (R. at 35, 38.) Plaintiff experienced difficulty concentrating and lacked motivation to "do anything else." (R. at 36, 43.)

F. Third-Party Testimony

Plaintiff's boyfriend, Justin Etheridge, testified during the hearing on September 20, 2012. (R. at 53-64.) Mr. Etheridge lived with Plaintiff for two to three years. (R. at 54.) He testified that Plaintiff drove herself approximately once or twice a month, but usually only when she needed to go to the store. (R. at 55.) Plaintiff occasionally went to the park and walked with him, but that became less frequent. (R. at 56.) Mr. Etheridge noted that Plaintiff had a lot of friends, but usually communicated with them through e-mail because Plaintiff had become "less and less" social. (R. at 57.) Mr. Etheridge testified that Plaintiff's condition had become worse and that Plaintiff was very difficult to live with, especially because of Plaintiff's germaphobia and obsession with symmetry. (R. at 61-62.) Plaintiff stopped going to school because of her inability to function. (R. at 58.)

G. Vocational Expert Testimony

During the hearing, an impartial vocational expert ("VE") testified. The ALJ asked the VE if a hypothetical person of the same age, education and work experience as Plaintiff, who had no exertional limitations, who could understand and carry out simple instructions and perform simple, routine work, with occasional interaction with co-workers and the general public and with occasional supervision, could perform Plaintiff's past work. (R. at 67.) The VE stated that such a person could not perform Plaintiff's past work. (R. at 67.) However, the VE explained that such an individual could work as a non-postal mail clerk with 70,000 jobs nationally and 2,600 jobs in Virginia, an assembler with 650,000 jobs nationally and 9,000 jobs in Virginia, or as a packer with 155,000 jobs nationally and 4,000 jobs in Virginia, and such jobs existed in significant numbers in the national economy. (R. at 67.)

Next, the ALJ asked the VE, assuming everything in the first hypothetical, whether an individual with similar psychological symptoms that included, but were not limited to a fear or phobia of leaving the home and being around other people, would consistently be off task two-thirds of an eight-hour work day. (R. at 68.) The VE stated that such a person would not be able to work. (R. at 68.) Finally, the ALJ asked the VE, if he assumed everything in the first hypothetical, whether the individual with like symptoms and who would miss more than two to five days of work per month would be able to perform any work. (R. at 68.) The VE stated that such a person would not be able to work. (R. at 68.)

## II.     PROCEDURAL HISTORY

On August 5, 2010, Plaintiff filed an application for DIB due to bipolar disorder, depression, anxiety, OCD, ADD and borderline personality disorder features with an alleged onset date of November 10, 2008. (R. at 17, 229.) Plaintiff's claim was initially denied on November 3, 2010, and again on reconsideration on January 25, 2011. (R. at 120, 126.) Plaintiff filed a request for a hearing on March 29, 2011, and appeared with counsel before an ALJ on September 20, 2012. (R. at 29, 129.) On September 27, 2012, the ALJ denied benefits. (R. at 23-24.) On October 17, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

## III.     QUESTIONS PRESENTED

A. Did the ALJ err in assigning little weight to the Plaintiff's treating physician's opinion?

B. Did the ALJ err in finding that Plaintiff maintained the RFC to perform simple routine work with occasional interaction with others?

C. Did the ALJ's hypothetical posed to the VE account for all of Plaintiff's limitations?

13

## D. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence on the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as a severe impairment that entitles one to benefit under

the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R.
§ 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, in constitutes a qualifying impairment and

the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to her past relevant work[7] based on an assessment of

the claimant's RFC[8] and the "physical and mental demands of work [the claimant] has done in

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits

will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the

analysis, such that she must prove that her limitations preclude her from performing her past

relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant can perform other work that is available in significant

numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207

---

[7]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for
an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[8]     RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record. *Id.*

F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## E. ANALYSIS

### A. The ALJ's Decision.

Plaintiff, represented by counsel, testified before the ALJ during a hearing on September 20, 2012. (R. at 31-92.) An impartial VE also testified during the hearing. (R. at 64-69.) On September 27, 2012, the ALJ issued a written opinion and determined that, based on the Plaintiff's August 5, 2010 application, Plaintiff was not disabled under the Act. (R. at 15-24.)

The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. at 17-24.) First, the ALJ determined that Plaintiff had last met the insured status requirement on December 31, 2013, and that Plaintiff had not engaged in SGA since Plaintiff's alleged onset date. (R. at 17.) At step two, the ALJ determined that Plaintiff suffered severe impairments in the form of bipolar disorder, depression, anxiety, OCD, ADD and borderline personality disorder features. (R. at 17.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or

17

equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. at 17-18).

At step four, the ALJ determined that Plaintiff maintained the RFC to perform a full range of work at all exertional levels, but with nonexertional limitations. (R. at 18.) Plaintiff was limited to simple, routine work with only occasional interaction with co-workers and the general public and with occasional supervision. (R. at 18.) In reaching this conclusion, the ALJ considered objective medical evidence and opinion evidence. (R. at 19.) The ALJ afforded Plaintiff's treating medical source opinion little weight, because Dr. Vozza's opinion was extreme and inconsistent with Plaintiff's course of treatment and GAF scores. (R. at 22.) The ALJ concluded that Plaintiff could not perform her past relevant work as a project manager/customer clerk, manager of a music store or a customer service representative. (R. at 23.) Finally, at step five, based upon Plaintiff's age, education, work experience and RFC, jobs existed in the national economy in significant numbers that Plaintiff could perform. (R. at 23-24.)

B. The ALJ did not err in affording Plaintiff's treating physician's opinion little weight.

Plaintiff argues that the ALJ erred in affording little weight to the opinions of Plaintiff's treating physician, Dr. Vozza. (Pl.'s Mem. at 7.) Defendant contends that substantial evidence supports the ALJ's determination to afford little weight to Dr. Vozza's opinion. (Def.'s Mem. at 14.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

In this case, the ALJ was forced to reconcile divergent opinions offered by Plaintiff's treating source, Dr. Vozza, Plaintiff's previous treating source, Dr. Relph, as well as Plaintiff's and Mr. Eldridge's testimony. In doing so, the ALJ afforded Dr. Vozza's opinion little weight, because it was extreme and inconsistent with Plaintiff's treatment and her GAF scores. (R. at 22.) Substantial evidence supports the ALJ's decision to afford little weight to Dr. Vozza's opinion.

Dr. Vozza treated Plaintiff between June 18, 2012 through June 21, 2012. (R. at 454-56.) Dr. Vozza completed a two-page, pre-written Mental Capacity Assessment form and checked boxes related to Plaintiff's concentration and persistence, social interaction and adaptation limitations. (R. at 454-55.) Dr. Vozza checked Plaintiff's social interaction and adaptation limitations as "extreme," indicating that Plaintiff was "unable to function in [each] area. There is

no useful ability to function in this area." (R. at 454-55.) Dr. Vozza checked three prompts regarding Plaintiff's concentration and persistence as "marked," indicating that Plaintiff was "unable to function in [these] area[s], two thirds of an eight-hour work day." (R. at 454-55.) In the same section, Dr. Vozza checked Plaintiff's limitations as "extreme" for six prompts. (R. at 454.) Finally, Dr. Vozza checked Plaintiff's "ability to make simple work-related decisions" and "ability to perform at a consistent pace with a one hour lunch break and two 15 minute rest periods" as "moderate," indicating that Plaintiff was "unable to function in [these] area[s], one third of an eight-hour work day." (R. at 454.) Dr. Vozza opined that Plaintiff had these limitations for twenty years. (R. at 456.)

Substantial evidence supports the ALJ's rejection of Dr. Vozza's opinion as it was inconsistent with other medical evidence. Dr. Relph treated Plaintiff for more than three years — June 2008 to March 2012. (R. at 414-15, 451.) During that time, Dr. Relph only assessed Plaintiff's GAF score at 48 and 50 in June 2008 and September 2008, respectively, indicating "serious symptoms . . . [or] serious impairment in social, occupational or school functioning." (R. at 20, 443-44, 449-50, 453.) After September 2008, Dr. Relph assessed Plaintiff's GAF score to be between 55 to 60, indicating "moderate symptoms . . . [or] moderate difficulty in social, occupational or school functioning." (R. at 21, 339, 342, 344, 347, 349, 351, 353, 357, 359, 361, 378, 408, 410, 412.)

On June 10, 2008, Dr. Relph noted that Plaintiff's memory was intact and Plaintiff exhibited fair insight and impulse control and logical thought process. (R. at 451-53.) On June 25, 2008, Dr. Relph noted that Plaintiff was well-oriented to all spheres, had soft speech, logical thought process and fair judgment, insight and impulse control. (R. at 450.) On August 5, 2008,

Dr. Relph observed that Plaintiff had logical thought process, appropriate judgment and fair insight and impulse control. (R. at 445.)

On December 8, 2008, Dr. Relph opined that Plaintiff was well-oriented with logical thought process, appropriate thought content and judgment, and fair insight and impulse control. (R. at 440.) On April 27, 2009, Dr. Relph noted that Plaintiff had blunted affect, logical thought process, appropriate thought content and judgment, fair insight and good impulse control. (R. at 439.) On December 1, 2009, Dr. Relph observed that Plaintiff was alert and well-oriented with appropriate dress and hygiene, appropriate motor activity, clear thought process, good insight and intact memory and impulse control. (R. at 338.)

On March 16, 2010, Dr. Relph noted that Plaintiff was alert and well-oriented with a depressed mood and constricted affect, but Plaintiff had clear and logical thought process, appropriate thought content, good insight and intact impulse control. (R. at 346.) On November 23, 2010, Dr. Relph noted that Plaintiff was well-oriented and alert with logical thought process, appropriate thought content and judgment, intact memory and impulse control and good insight. (R. at 377.) On July 20, 2011, Dr. Relph opined that Plaintiff was well-oriented with logical thought process, appropriate thought content and judgment, intact memory and impulse control, and good insight. (R. at 409.) On September 21, 2011, Dr. Relph noted that Plaintiff had coherent speech, clear thought process, appropriate thought content and judgment, intact memory and impulse control and good insight. (R. at 411.)

Plaintiff's testimony further supports the ALJ's decision. Plaintiff reported that she had a driver's license and would drive approximately once every other week. (R. at 22.) Plaintiff also testified that she accompanied her boyfriend to the grocery store. (R. at 22, 40, 56, 246, 249.) Plaintiff occasionally walked in the park with her boyfriend. (R. at 22, 56.) Plaintiff also

reported that she traveled to Pennsylvania and Florida after her alleged onset date. (R. at 22, 41-42.) Plaintiff stated that she watched television, used a computer, and prepared simple snacks or foods on a daily basis. (R. at 22, 42-44, 246.)

Third party testimony also supports the ALJ's determination. Plaintiff's boyfriend, Mr. Etheridge, also testified to Plaintiff's limitations, but noted that Plaintiff drove, made simple food for herself and used the computer or watched television daily. (R. at 22, 55, 57, 59, 61-62.) Mr. Etheridge also testified that Plaintiff has "a good amount of friends," and despite being less social, still emailed them. (R. at 57.) Therefore, substantial evidence supports the ALJ's decision to afford Plaintiff's treating physician little weight.

### C. The ALJ did not err in determining that Plaintiff had the ability to perform simple routine work with occasional interaction with others.

Plaintiff contends that the ALJ erred in finding that Plaintiff maintained the ability to perform work at all exertional levels with nonexertional limitations, because Plaintiff argues that she could not work. (Pl.'s Mem. at 6-7.) Specifically, Plaintiff contests the ALJ's decision regarding the nonexertional limitations. (Pl.'s Mem. at 6-7.)[9] Defendant responds that substantial evidence supports the ALJ's RFC determination. (Def.'s Mem. at 12-14.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making her RFC determination; however, before a determination is made that a claimant is not

---

[9] Plaintiff does not contest the RFC to the extent of the physical limitations.

disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels with nonexertional limitations. (R. at 18.) Specifically, Plaintiff was limited to simple, routine work with only occasional interaction with co-workers and the general public, and with occasional supervision. (R. at 18.)

Substantial evidence supports the ALJ's determination regarding Plaintiff's nonexertional limitations on the basis of medical evidence. On June 25, 2008, Dr. Relph noted that Plaintiff was oriented to name, place, time and situation, exhibited soft speech, "down" mood and dysphoric affect. (R. at 450.) Plaintiff demonstrated logical thought process, appropriate thought content with no delusions, appropriate judgment and fair insight and impulse control. (R. at 450.) During August, September and October of 2008, Dr. Relph indicated that Plaintiff was well-oriented with normal speech and motor activity, along with an "ok" mood with constricted affect. (R. at 442-43, 445.) Plaintiff had logical thought process, appropriate judgment and thought content and fair insight and impulse control. (R. at 442-43, 445.) On November 10, 2008, Dr. Relph noted that Plaintiff remained well-oriented with normal motor activity and speech. (R. at 441.) Plaintiff had a reactive affect, logical thought process, no suicidal intention or delusions, appropriate judgment and thought content, and fair insight and impulse control. (R. at 441.) On December 8, 2008, Dr. Relph described Plaintiff's mood as

"ok," but well-oriented with constricted affect, logical thought process, appropriate judgment and thought content, and fair insight and impulse control. (R. at 440.)

During April and June of 2009, Dr. Relph described Plaintiff's mood as "mutated," but "better." (R. at 437, 439.) Plaintiff exhibited intact orientation, normal speech and motor activity, reactive affect, logical thought process, appropriate judgment and thought content with fair insight and impulse control. (R. at 437, 439.) On June 5, 2009, Plaintiff reported that her anxiety improved while taking Prozac, which made it easier to attend class. (R. at 437.) During September and December of 2009, Dr. Relph indicated that Plaintiff was alert and well-oriented to person, place, time and situation. (R. at 338, 384.) Plaintiff's mood was "okay" with reactive affect and she exhibited coherent speech, judgment and thought content, intact memory, good insight, intact impulse control and no suicidal ideation, homicidal ideation or psychosis. (R. at 33, 384.)

During February, March and April of 2010, Dr. Relph described Plaintiff as alert and well-oriented with no suicidal ideation, homicidal ideation or psychosis and a depressed mood with constricted affect. (R. at 343, 346, 348.) Plaintiff had coherent speech, judgment and thought content, logical thought process, good insight and intact memory and impulse control. (R. at 343, 346, 348.) On May 5, 2010, Plaintiff remained alert and well-oriented with no suicidal ideation, homicidal ideation or psychosis and a depressed mood with constricted affect. (R. at 350.) Plaintiff had coherent speech, judgment and thought content, logical thought process, good insight and intact memory and impulse control. (R. at 350.) Plaintiff reported that her energy and motivation had improved while taking Wellbutrin XL. (R. at 352.)

During June and August 2010, Dr. Relph described Plaintiff as alert and well-oriented to person, place, time and situation with no suicidal ideation, homicidal ideation or psychosis. (R.

at 356, 358, 360.) On August 31, 2010, Plaintiff reported that her anxiety and insomnia had improved. (R. at 360.) On November 23, 2010, Dr. Relph noted that Plaintiff was alert and well-oriented with no suicidal ideation, homicidal ideation or psychosis. (R. 377.) Plaintiff had clear thought process, appropriate judgment and thought content, good insight and intact memory and impulse control. (R. at 377.)

Substantial evidence supports the ALJ's decision on the basis of Plaintiff's own statements. Plaintiff noted that she only "sometimes need[ed] reminding[,] but not much," to take her medications. (R. at 248.) Plaintiff further noted that her condition had no effect on her ability to count change, handle a savings account or use a checkbook/money orders. (R. at 249-50.) She spent time with her boyfriend and socialized with her friends. (R. at 250.) Although Plaintiff reported that she does not get along well with authority figures (R. at 252), Mr. Etheridge stated that she gets along "fine" with bosses and authority figures. (R. at 261.) Plaintiff indicated that she did not handle stress or changes in her routine well. (R. at 252.)

Plaintiff herself reported that her condition did not affect her ability to talk, hear, see, complete tasks, follow instructions or get along with others. (R. at 251.) Mr. Etheridge also indicated that Plaintiff's condition did not impact her ability to understand, follow instructions, hear, concentrate, talk, or get along with others. (R. at 260.) Therefore, the ALJ addressed all limitations in Plaintiff's RFC and did not err in finding that Plaintiff maintained the ability to perform the full range of work at all exertional levels with nonexertional limitations.

D. The hypothetical posed to the VE correctly accounted for all of Plaintiff's limitations.

Plaintiff argues that Defendant failed to meet her burden at step five, because the hypothetical failed to ensure that the VE knew Plaintiff's abilities and limitations. (Pl.'s Mem. at

7.) Defendant contends that the hypotheticals posed to the VE accurately took into account Plaintiff's RFC. (Def.'s Mem. at 12-14.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner can carry her burden in the final step with the testimony of a VE. As noted earlier, when a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

During a hearing on September 20, 2012, the ALJ posed several hypotheticals to the VE. The ALJ first asked the VE to assume an individual with no exertional limitations who maintained the ability to perform work that is limited to simple instructions and to "perform simple, routine work, with occasional interaction with co-workers and with the general public, and occasional supervision." (R. at 67.) The VE opined that the person could perform unskilled work, including as a non-postal mail clerk with 70,000 jobs nationally and 2,600 jobs in Virginia, an assembler with 650,000 jobs nationally and 9,000 jobs in Virginia, and as a packer with 155,000 jobs nationally and 4,000 jobs in Virginia. (R. at 67.) The ALJ's second hypothetical asked the VE to assume an individual with the same abilities as in the aforementioned hypothetical, but added a limitation whereby the individual would be off task for

two-thirds of an eight-hour work day on a consistent basis. (R. at 68.) The VE opined that the

person would not be able to work. (R. at 68.) The ALJ's final hypothetical asked the VE to

assume an individual with the same abilities as the first hypothetical, but with an added

limitation whereby the individual would miss two or more days of work per month. (R. at 68.)

The VE opined that the person would not be able to work. (R. at 68.)

Plaintiff argues that the latter two hypothetical RFC's posed to the VE should control.

(Pl.'s Mem. at 6-7.) However, the ALJ's initial hypothetical posed to the VE was appropriate

because it accounted for Plaintiff's RFC. As noted above, substantial evidence supports the

ALJ's RFC determination. Because the hypothetical posed to the VE took into account all of

Plaintiff's limitations described in the RFC and substantial evidence supports the RFC

determination, the ALJ did not err.

## F. CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary

Judgment (ECF No. 15) be DENIED; that Defendant's Motion for Summary Judgment (ECF No.

18) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to

the Honorable John A. Gibney, Jr. with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a de novo review of the determinations contained in the report and such failure**

shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

                                                           /s/

                                                      David J. Novak
                                                      United States Magistrate Judge

Richmond, Virginia
Date: November 19, 2014